**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:10-cv-00701-JLK


SUZANNE KENNEDY, on behalf of
herself and all others similarly situated,

      **Plaintiff,**

v.

THE COCA-COLA COMPANY,
GERBER PRODUCTS COMPANY,
HAIN CELESTIAL GROUP, INC.,
and MOTT'S INC.,

      **Defendants.**

---

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
---

Plaintiff Suzanne Kennedy ("Plaintiff"), individually and on behalf of all others similarly

situated, bring this action against The Coca-Cola Company, Gerber Products Company, Hain

Celestial Group, Inc., and Mott's Inc. ("Defendant" or collectively "Defendants"), demanding a

trial by jury, and alleges as follows:

### NATURE OF THE CASE

1.    This is a proposed class action seeking redress for Defendants' deceptive

practices in misrepresenting and/or omitting the true nature of certain of their products reported

to contain lead, including Earth's Best® Organics Apple Juice, Gerber 100% Juice Apple Juice,

Minute Maid® Juice Apple – 100% Apple Juice, Motts 100% Apple Juice, Gerber 3d Foods

Pears, Gerber 3d Foods Peaches, and Del Monte Pear Halves (collectively, the "Contaminated

Products") in order to market those products for consumption by children, all in violation of

Colorado law.

2.      On June 9, 2010, Defendants were notified by the Environmental Law Foundation (a California non-profit organization) concerning the Contaminated Products' and other products' violations of California's Safe Drinking Water and Toxic Enforcement Act of 1986, California Health and Safety Code sections 25249, *et seq.* ("Proposition 65") due to excessive lead levels.  In particular, the Contaminated Products reportedly contain lead levels without any warning that they do.

3.      The notice alleged the toxic chemical lead was found in a variety of children's and baby foods manufactured and sold by Defendants in violation of Proposition 65's provision that "No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual…"

4.      The notice identified 125  specific products containing lead in amounts greater than the permissible daily intake level set forth by Proposition 65 of .5 micrograms per day in the following food categories: apple juice, grape juice, packaged pears and peaches (including baby food), and fruit cocktail.

5.      In addition to having reportedly have violated Proposition 65, Defendants have violated the laws of Colorado, as described below.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(d), because the aggregate claims of the proposed Class (defined below) exceed the sum or value of $5,000,000.00, and there is diversity of citizenship between proposed class members and Defendants.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§1391(a)(1) & (2). Substantial acts in furtherance of the alleged improper conduct occurred within this District. Plaintiff resides within this District and bought Defendants' Contaminated Products within this District.

### THE PARTIES

8.      Plaintiff Suzanne Kennedy is an individual consumer who, at all times material hereto, was a resident of Aspen, Colorado, and therefore is a "citizen" of Colorado for purposes of diversity.

9.      The Coca-Cola Company ("Coca-Cola") is organized and existing under the laws of the State of Delaware with its principal place of business located at 121 Baker Street Northwest, Atlanta, Georgia 30313-1807.  For the purposes of diversity jurisdiction, Coca-Cola may be considered a "citizen" of either Delaware or Georgia.  At all times relevant hereto, Coca-Cola was and is doing business within this District either directly or indirectly through the sale of its products in this District.  Minute Maid® 100% Juice Apple Juice is among Coca-Cola's products.

10.      At all times herein mentioned, the employees of Coca-Cola, its subsidiaries, affiliates and other related entities, were the agents, servants and employees of Coca-Cola, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment.  Whenever reference in this Complaint is made to any act or transaction of Coca-Cola, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of Coca-Cola committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of Coca-Cola while actively engaged in the scope of their duties.

11.     Gerber Products Company ("Gerber") is organized and existing under the laws of the State of Michigan with its principal place of business located at 12 Vreeland Road, Florham Park, New Jersey 07932.  For the purposes of diversity jurisdiction, Gerber may be considered a "citizen" of either Michigan or New Jersey.   Gerber® NatureSelect™ 3rd Foods® Fruits – Peaches, Gerber® NatureSelect™ 3rd Foods® Fruits – Pears, and Gerber® 100% Fruit Juices – Apple Juice are among Gerber's products. Gerber® NatureSelect™ products are particularly marketed toward children.[1]

12.     At all times relevant hereto, Gerber was and is doing business within this District either directly or indirectly through the sale of its products in this District. At all times herein mentioned, the employees of Gerber, its subsidiaries, affiliates and other related entities, were the agents, servants and employees of Gerber, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment.   Whenever reference in this Complaint is made to any act or transaction of Gerber, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of Gerber committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of Gerber while actively engaged in the scope of their duties.

13.     The Hain Celestial Group, Inc. ("Hain") is organized and existing under the laws of the State of Delaware with its principal place of business located at 58 South Service Road, Melville, New York 11747.  For the purposes of diversity jurisdiction, Hain may be considered a "citizen" of either Delaware or New York.  At all times relevant hereto, Hain was and is doing business within this District either directly or indirectly through the sale of its products in this

---

[1] http://www.gerber.com/AllStages/Products/3rd_FOODS_Fruits.aspx (accessed July 7, 2010).

District.   Earth's Best® is among Hain's brands and Earth's Best® Organics Apple Juice is among Hain's products.  Earth's Best® is a line particularly marketed toward children.[2]

14.     At all times herein mentioned, the employees of Hain, its subsidiaries, affiliates and other related entities, were the agents, servants and employees of Hain, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment. Whenever reference in this Complaint is made to any act or transaction of Hain, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of Hain committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of Hain while actively engaged in the scope of their duties.

15.     Mott's Inc. ("Mott's") is organized and existing under the laws of the State of Delaware with its principal place of business located at 6 High Ridge Park, Stamford, Connecticut 06905.  For the purposes of diversity jurisdiction, Mott's may be considered a "citizen" of either Delaware or Connecticut.  At all times relevant hereto, Mott's was and is doing business within this District either directly or indirectly through the sale of its products in this District.

16.     At all times herein mentioned, the employees of Mott's, its subsidiaries, affiliates and other related entities, were the agents, servants and employees of Mott's, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment. Whenever reference in this Complaint is made to any act or transaction of Mott's, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of Mott's committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of Mott's while actively engaged in the scope of their duties.

---

[2] http://www.earthsbest.com/ (accessed July 7, 2010).

## FACTUAL ALLEGATIONS

**A.     Children Are More Susceptible To Chemical Toxicity Than Are Adults**

17.     The fact that children are more susceptible to chemical toxicity than adults is widely recognized.

18.     The National Academy of Sciences published a report in 1993 entitled "Pesticides in the Diets of Infants and Children" ("NAS Report").  NAS explained that children are not little adults with respect to potential chemical toxicities:

> "A fundamental maxim of pediatric medicine is that children are not 'little adults.'
> **Profound differences exist between children and adults.**  Infants and children are
> growing and developing.  Their metabolic rates are more rapid than those of adults.
> There are differences in their ability to activate, detoxify, and excrete xenobiotic
> compounds.  All these differences can affect the toxicity of pesticides in infants and
> children, and for these reasons the toxicity of pesticides is frequently different in children
> and adults [....]

(NAS Report, at 3-4) (emphasis added).

19.     The Natural Resources Defense Council ("NRDC") issued a report in 1997 entitled "Our Children At Risk; The 5 Worst Environmental Threats To Their Health."  NRDC explained that children are relatively more susceptible to potential chemical toxicities:

> "Pound for pound, children breathe more air, drink more water, and consumer more food
> than adults.  **This higher rate of intake means that children will receive higher doses
> of whatever contaminants are present** in the air, water, or food.  In addition, **infants
> have a relatively greater surface area of skin than adults, thereby increasing their
> potential dermal absorption of certain compounds**....  A typical newborn weighs one-
> twentieth of the weight of an adult male, but the infant's surface area is one-eighth as
> great.  Therefore, the total area of skin that could be exposed to a chemical...is two and a
> half times as great per unit of body weight in the infant as in the adult."

(NRDC Report, Ch. 2) (citing  International Programme on Chemical Safety, Principles for Evaluating Health Risks From Chemicals During Infancy and Early Childhood: The Need for a Special Approach, Environmental Health Criteria 59, World Health Organization, 1986) (emphasis added).

6

20.     The United States Environmental Protection Agency ("EPA") issued its "Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens," ("EPA Supplemental Guidance") in early 2005.   EPA recognized that toxicokinetic and toxicodynamic differences between children and adults are greatest during the first two years of life.  (EPA Supplemental Guidance, at 32) (citations omitted).

- Later in 2005, the Intergovernmental Forum on Chemical Safety's ("IFCS") Children and Chemical Safety Working Group published a report titled "Chemical Safety and Children's Health; Protection the world's children from harmful chemical exposures:  a global guide to resources" ("2005 IFCS Report").   IFCS concluded that children are uniquely prone to harmful chemical exposures and their adverse health effects because:

- "Children's **exposure begins at conception**, as chemicals in a pregnant woman's body cross the placenta and affect the embryo or fetus during critical periods of development. Some chemicals also accumulate in breast milk, compromising (though not negating) the benefits of this important food for infants.

- "Even after birth, children's **bodies remain immature**, with underdeveloped detoxification mechanisms to protect them from chemicals.

- "Their **brains and other organ systems are constantly developing**, undergoing periods of particular sensitivity to damage or disruption.

- "Compared with adults, children **breathe faster and eat and drink more** in proportion to their bodyweight, resulting in greater exposure to chemicals in air, food, and water.

- "Children **spend more time outdoors**, and often play on the ground or the floor, where chemicals such as pesticides and heavy metals are present.   In addition, young children frequently **place their hands or other objects in their mouths**, making ingestion of chemicals more likely.

- "Pregnant women and young children are often at higher risk of **inhaling or coming into contact with chemicals used indoors**, such as cleaning solutions, paints, cosmetics, and other household and consumer products.

- "Children are **less aware of potential chemical risks around them**, and are therefore less likely to avoid harmful exposures."

(2005 IFCS Report, at 3) (emphasis in original) (footnote omitted).

21.     Based on this empirical data and the fact that Defendants' conduct is directed at children who are more susceptible to chemical exposures, Defendants needed to be particularly vigilant to ensure that their food products did not contain harmful chemicals that might have both short and long term health effects, even at potentially very small exposure levels.

B.     **The Contaminated Products are Hazardous to Children's Health**

22.     The Contaminated Products reportedly contain the known hazardous chemical

lead.

23.     Lead is widely recognized to be toxic, particularly with respect to children.

24.     For example, the NTP's substance profile for lead and lead compounds states, in

part:

Lead and lead compounds are ***reasonably anticipated to be human carcinogens*** based on limited evidence from studies in humans and sufficient evidence from studies in experimental animals.   Lead exposure has been associated with increased risk of lung, stomach, and bladder cancer in diverse human populations (Fu and Boffetta 1995, Steenland and Boffetta 2000, NTP 2003).

**Absorption of lead is affected by age**, the chemical form of the lead, and minerals in the diet (e.g., iron, calcium, and zinc) (ATSDR 1999). **Gastrointestinal absorption of lead is greater in children than in adults** (Hammad *et al.* 1996).   Once absorbed, lead is distributed to blood plasma, the nervous system, and soft tissues.   It subsequently is redistributed and accumulates in bone; approximately 75% to 90% of the lead body burden is found in bones and teeth.   (emphasis added.)

Lead concentrations in U.S. drinking water generally are below 5 μg/L. Lead also is found in food, cigarette smoke, and alcoholic beverages. Levels in food have declined since the elimination of lead- soldered food cans between 1979 and 1989 (ATSDR 1999). In 1990, the estimated daily intake of lead from consumption of food, water, and beverages was approximately 4 μg for children 2 years of age and younger, 6 to 9 μg for children aged 14 to 16, 6 to 9 μg for adults aged 25 to 30, and 2 to 8 μg for adults aged 60 to 65. For young children, the most common source of environmental lead exposure is direct ingestion of paint chips and lead-laden dusts and soils released from aging painted surfaces. These sources can contribute an additional daily intake of 5 μg for a toddler engaging in normal hand-to-mouth activity (CDC 1997, Lanphear et al. 1998).

25.     The IARC monograph regarding lead states, in part:

**A considerable body of evidence suggests that children are more sensitive than adults to the neurotoxic properties of lead**. Although clinical symptoms of toxicity generally become apparent at blood lead concentrations of 70 μg/dL, many important disturbance occur at much lower concentrations. These include electrophysiological anomalies of evoked brain potential in response to auditory stimuli and reduced peripheral nerve conduction. Both cross-sectional and

prospective studies of children have found impairments in cognition, attention, and language function at concentrations of lead previously thought to be harmless. In studies with larger samples, better measures of lead burden and neuro-behavioural function, and more advanced statistical techniques, effects are detectable at blood lead concentrations below 10 μg/dL. The relative effect is greater below 10 μg/dL than above this level. Recently, attention has shifted from the impact of lead on cognition to its effects on behaviour. Exposure to lead has been found to be associated with attentional dysfunction, aggression and delinquency.

Exposure to lead is associated with cardiovascular effects and with changes in endocrine and immune functions.

Many of the effects of lead exposure in humans have been confirmed in experimental systems. At the cellular level, lead has mitogenic properties; it affects various regulatory proteins, including those that depend on the presence of zinc.

* * *

Inorganic lead compounds are *probably carcinogenic to humans (Group 2A).*
Organic lead compounds are *not classifiable as to their carcinogenicity to humans (Group 3).*
The Working Group noted that organic lead compounds are metabolized, at least in part, to ionic lead both in humans and animals.  To the extent that ionic lead, generated from organic lead, is present in the body, it will be expected to exert the toxicities associated with inorganic lead.[3]

26.     The Agency for Toxic Substances and Disease Registry (ATSDR) published a case study in environmental medicine (CSEM) concerning lead toxicity on August 20, 2007.

The CSEM's environmental alert states:

- Children of all races and ethnic origins are at risk of lead toxicity throughout the U.S.

- Lead may cause irreversible neurological damage as well as renal disease, cardiovascular effects, and reproductive toxicity.

- Blood lead levels once considered safe are now considered hazardous, with no known threshold.

- Lead poisoning is a wholly preventable disease.[4]

---

[3] IARC Monographs Volume 87, pp. 375 - 378.

[4] CSEM, p.1.

27.    The CSEM also states that lead exposure in the general population (including children) occurs primarily through ingestion[5] and further explains:

Because of their behavior and physiology, **children are more affected** by exposure to lead than are adults.

- Children absorb more ingested lead than do adults.

\* \* \*

- In addition, the percent of lead absorbed in the gut, especially in an empty stomach, is estimated to be as much as five to 10 times greater in infants and young children than in adults. (Alexander *et al.* 1974; Chamberlain *et al.* 1978; James *et al.* 1985; Ziegler *et al.* 1978 as cited in ATSDR 1999).
- Gastrointestinal absorption of lead in children is increased by iron, calcium, zinc, and ascorbate deficiency. (Mahaffey *et al.* 1990 as cited in AAP 1993)

**Children are more sensitive** than adults are to elevated BLLs. Children's **developing brains** and **nervous system** (and other organ systems) are very sensitive to lead.

- **Childhood lead exposure** has been associated with
- higher absenteeism in high school
- lower class rank
- poorer vocabulary and grammatical reasoning scores
- longer reaction time
- poorer hand-eye coordination (AAP, 1993)
- The incomplete development of the blood-brain barrier in fetuses and in very young children (up to 36 months of age) increases the risk of lead's entry into the developing nervous system, which can result in prolonged or permanent neurobehavioral disorders.
- Children's renal, endocrine, and hematological systems may also be adversely affected by lead exposure.

There is **no known threshold exposure level** (as indicated by BLLs) for many of these effects. No blood lead threshold for adverse health effects has been identifie[d] in children.

\* \* \*

Children suffer neurological effects at much lower exposure levels.

- Neurological effects may begin at low (and, relatively speaking, more

---

[5] *Id.*, p.16.

widespread) BLLs, at or below 10 μg/dL in some cases, and it may not be possible to detect them on clinical examination.

- Some studies have found, for example, that for every 10 μg/dL increase in BLL, children's IQ was found to be lower by four to seven points. (Yule et al., 1981; Schroeder et al., 1985; Fulton et al., 1987; Landsdown et al. 1986; Hawk et al. 1986; Winneke et al. 1990 as cited in AAP 1993).
- There is a large body of evidence that associates decrement in IQ performance and other neuropsychological defects with lead exposure.
- There is also evidence that attention deficit hyperactivity disorder (ADHD) and hearing impairment in children increase with increasing BLLs, and that lead exposure may disrupt balance and impair peripheral nerve function. (ATSDR 2005).
- Some of the neurological effects of lead in children may persist into adulthood.[6]

28.      Several States have specifically recognized the dangers posed by lead.

29.      For example, in California, "lead" was placed in the Governor's list of chemicals known to the State of California to cause reproductive toxicity on February 27, 1987.  It is specifically identified under three subcategories:  "developmental reproductive toxicity," which means harm to the developing fetus, "female reproductive toxicity," which means harm to the female reproductive system, and "male reproductive toxicity," which means harm to the male reproductive system.  (Cal. Code Regs., tit. 22, § 12000, subd. (c).)   "Lead and lead compounds" was placed in the Governor's list of chemicals known to the State of California to cause cancer on October 1, 1992.  (Cal. Code Regs., tit. 22, § 12000, subd. (b).)

30.      The Colorado Department of Public Health and Environment conducted a survey of blood lead levels among children during 1995 and published its Final Report entitled "Denver Childhood Blood Lead Survey" in January 1996 in which the Department recognized potential adverse health effects to children associated with exposure to lead, including:

- "Lead is a poison that affects virtually every system in the body."
- "It is particularly harmful to the developing brain and nervous system of fetuses and young children."

---

[6] *Id.*, pp. 18 – 31 (emphasis added).

- "Lower levels cause adverse effects on the central nervous system, kidney, and hematopoietic system."
- "Blood lead levels as low as 10 μg/dL, which do not cause distinctive symptoms, are associated with decreased intelligence and impaired neurobehavioral development."
- "Many other effects begin at these low blood lead levels, including decreased stature or growth, decreased hearing acuity, and decreased ability to maintain a steady posture."

31.     New Jersey's Department of Health and Senior Services has published a Right to

Know Hazardous Substance Fact Sheet that states in part:

> Lead can affect you when inhaled or swallowed.
> Lead is a CARCINOGEN and may be a TERATOGEN[…].
> * * *
> Lead may damage the nervous system.
> Exposure may cause kidney and brain damage, and anemia.
> * * *
> Lead is a PROBABLE CARCINOGEN in humans and may be a TERATOGEN in humans.  There may be <u>no</u> safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level.
> * * *
> Lead is a PROBABLE CARCINOGEN in humans.  There is some evidence that Lead and Lead compounds cause lung, stomach, brain and kidney cancers in humans and they have been shown to cause kidney cancer in animals.
> Many scientists believe there is no safe level of exposure to a carcinogen.

32.     New York, Connecticut, and Georgia (among other States) also recognize that

lead is hazardous.

## C.     Defendants Either Were Aware or Reasonably Should Have Known the Food Products were Defective and Potentially Unsafe for Children.

33.     At all relevant times, Defendants were in a superior position (relative to

consumers) to know, knew, or reasonably should have known, that certain of their food products

contained lead in amounts that could harm children.

34.     All Defendants go to great lengths to promote the quality and safety of their

products, yet none of Defendants' promotional materials or labels disclosed the fact that the

Contaminated Products contained lead or provided any warning concerning the potential adverse health effects associated with ingestion of lead.

35.     For example, Gerber warrants on its web site:  "Nestle and Gerber are fully committed to product safety and quality.  We back this commitment with strict ingredient specifications, multiple sample tests, and strict safety programs to ensure that our products comply with regulatory requirements and are unquestionably safe for babies [….]   When ingredients arrive at our manufacturing locations, they are carefully inspected to assure us that they meet our requirements [….] At the beginning of each season, we meet with our growers and give them an annual crop report card.  Our growers must provide spray history records and adhere to our pesticide restriction protocols.  This process helps us know as much as possible about the produce that's coming from our growers' fields and orchards."[7]

36.     Hain warrants on its Earth's Best® web site:  "Earth's Best produces food with the highest degree of attention to quality and safety.  Each ingredient is tested for pesticides and potentially harmful residues.  No product is released until our quality assurance department approves laboratory results, ensuring we meet the strict standards for organic certification." [8]

37.     Mott's web site provides a link to Mott's® Fresh Apples, wherein it states:  "It's the extra steps we take, like using quality inspection teams to monitor each step of the process to enforce stringent quality standards, labeling all Mott's® apples and pears with place of origin, and encouraging you – the customer – to give us feedback [….]  All this means there's one thing you can count on:  consistent, high quality, fresh apples and pears that will make your mouth water!  We want you to feel confident that you're giving your family the best."[9] Moreover, as to

---

[7] http://www.gerber.com/AllStages/About/Research_Safety.aspx (accessed July 7, 2010).
[8] http://www.earthsbest.com/why-earths-best/product-testing (accessed July 7, 2010).
[9] http://www.mottsfresh.com/motts_quality.asp (accessed July 7, 2010).

Defendant Mott's, it has been or should have aware of metal contamination problems with its products no later than March 14, 2010, when the St. Petersburg Times reported results of independent testing of samples of kid-friendly apple juice boxes that found levels of arsenic in some samples that surpassed the FDA's level of concern for heavy metals in juices.[10]   Arsenic, like lead, is known to cause cancer.

38.     Coca Cola's web site states:   "We measure key product and package quality attributes to ensure our beverage products in the marketplace meet Company requirements and consumer expectations [….]   To stay current with new regulations, industry best practices and marketplace conditions, we consistently reassess the relevance of our product safety and quality guidelines in [The Coca-Cola Management System] ["TCCMS"].   Given the increased awareness of the importance of food safety, not only in manufacturing but also throughout the entire supply chain, we are refining our requirements to further ensure that TCCMS embodies the most recent and stringent manufacturing processes."[11]   Moreover, in response to a consumer's questions concerning high fructose corn syrup in Minute Maid®, and individual identified as "Cameron", Industry and Consumer Affairs, The Minute Maid Company, minutemaid.support@na.ko.com responded:   "Please be assured that Minute Maid brand soft drinks do not contain any harmful substances.   All Minute Maid brand products are wholesome beverages manufactured in compliance with the federal law governing food safety and labeling, the laws of all the states, and the laws of over 200 countries throughout the world where they are sold."[12]

---

[10] http://www.tampabay.com/news/health/article1079395.ece
[11] http://www.thecoca-colacompany.com/citizenship/quality.html (accessed July 7, 2010).
[12] http://www.facebook.com/note.php?note_id=421737007320&comments (accessed July 7, 2010)

**D.**     **Plaintiff's Allegations**

39.     On personal knowledge, Plaintiff purchased the Contaminated Products for herself and her children regularly during the past eight months from various stores, including Target, City Market and Clark's Market in Aspen, Colorado.

40.     On personal knowledge, as a result of Defendants' deceptive acts and practices, Plaintiff was misled into purchasing the Contaminated Products, thereby resulting in her suffering injury in fact and a loss of money or property resulting from Defendants' conduct. Had warnings concerning the levels of lead in the Contaminated Products been made by Defendants (which were not) Plaintiff would not have purchased any of the Contaminated Products and exposed herself and her children to the widely recognized potential health problems associated with lead.

**E.**     **Defendants' Actionable Practices**

41.     Defendants manufactured, designed, advertised, marketed, packaged, labeled, distributed and sold Contaminated Products as safe for consumption by children.

42.     However, none of the Defendants disclosed the presence of lead in the Contaminated Products .

43.     Gerber depicts its Gerber® NatureSelect™ 3rd Foods® Fruits -- Peaches on its web site as follows:

# GERBER® NatureSelect™ 3rd FOODS® Fruits

### 3rd FOODS Fruits – Peaches

**We're sorry but this variety has been discontinued.**
For other products your child may be ready for or want to try, visit the products page.



*Always refer to the product packaging for the most accurate and up to date product information.

**Nutrition Facts**

| | |
|---|---|
| Serv. Size 1 jar | |
| Servings Per Container | |
| **Amount Per Serving** | |
| **Calories** 110 | |
| **Total Fat:** | 0g |
| Trans Fat: | 0g |
| **Sodium:** | 15mg |
| **Potassium:** | 270mg |
| **Total Carbohydrates:** | 25g |
| Dietary Fiber: | 2g |
| Sugars: | 20g |
| **Protein:** | 1g |
| **%Daily Value** | |
| Protein: Not a significant source of protein | Vitamin A: 20% |
| Vitamin C: 45% | Calcium: 0% |
| Iron: 0% | Zinc: 2% |

**Ingredients**
PEACHES, PEACHES FROM CONCENTRATE (WATER, PEACH CONCENTRATE), WHITE GRAPE JUICE CONCENTRATE, ASCORBIC ACID (VITAMIN C)

### Did you know?
GERBER purees contain no added refined sugar, salt, or starch.

16

44.     Gerber depicts its Gerber® NatureSelect™ 3rd Foods® Fruits -- Pears on its web site as follows:

# GERBER® NatureSelect™ 3rd FOODS® Fruits

### NatureSelect 3rd FOODS Fruits – Pears

Ingredients Carefully Selected To
Meet GERBER High Quality
Standards



*Always refer to the product packaging for the most accurate and up to date product information.

**Nutrition Facts**

Serv. Size 1 jar
Servings Per Container

Amount Per Serving

| Calories 120 | |
|---|---|
| **Total Fat:** | 0g |
| Trans Fat: | 0g |
| **Sodium:** | 10mg |
| **Potassium:** | 230mg |
| **Total Carbohydrates:** | 30g |
| Dietary Fiber: | 4g |
| Sugars: | 21g |
| **Protein:** | <1g |

%Daily Value

| Protein: Not a significant source of protein | Vitamin A: 0% |
|---|---|
| Vitamin C: 45% | Calcium: 2% |
| Iron: 2% | Zinc: 4% |

**Ingredients**
PEARS, PEARS FROM CONCENTRATE (WATER, PEAR
CONCENTRATE), ASCORBIC ACID (VITAMIN C), CITRIC ACID

### Did you know?
GERBER purees contain no added refined sugar, salt, or starch.

17

45.    Gerber depicts its Gerber® 100% Fruit Juices – Apple Juice  on its web site as follows:

# GERBER® 100% Fruit Juices*

### 100% Fruit Juices – Apple Juice 32oz.



*Always refer to the product packaging for the most accurate and up to date product information.

**Nutrition Facts**

Serv. Size 1/2 cup (4 fl oz/118 mL)
Servings Per Container About 8

Amount Per Serving

**Calories** 60

| | |
|---|---|
| **Total Fat:** | 0g |
| Trans Fat: | 0g |
| **Sodium:** | 10mg |
| **Potassium:** | 115mg |
| **Total Carbohydrates:** | 14g |
| Dietary Fiber: | 0g |
| Sugars: | 13g |
| **Protein:** | 0g |

%Daily Value

Protein: 0%     Vitamin A: 0%
Vitamin C: 100% Calcium: 0%
Iron: 0%

**Ingredients**
APPLE JUICE FROM CONCENTRATE (WATER, APPLE JUICE CONCENTRATE), ASCORBIC ACID (VITAMIN C).

### Did you know?
Each 4 fl. oz. bottle of GERBER Juice is an excellent source of Vitamin C, a Protective Antioxidant that is an essential building block of your baby's natural defense system.

46.     Hain depicts its Earth's Best® Organic Apple Juice on its web site as follows:



47.    Coca Cola depicts its Minute Maid® Apple Juice on its web site as follows:



## CLASS ACTION ALLEGATIONS

48.    Pursuant to F.R.C.P. 23, Plaintiff brings this action on behalf of herself and a Class of persons comprised of all consumers who purchased the Contaminated Products for personal, family or household purposes in Colorado during the past four years (the "Class"). Defendants' advertising and promotional practices as detailed above were applied uniformly to all members of the Class throughout the relevant time period, so that the questions of law and fact detailed herein are common to all members of the Class.   All Class members were and are similarly affected by having purchased the Contaminated Products for their intended and foreseeable purpose as promoted, marketed, advertised, packaged and labeled by Defendants and as set forth in detail above.

49.    Based on the annual sales of the Contaminated Products and the popularity of the Contaminated Products, the number of purchasers of the Contaminated Products would likely be in the many thousands, thereby making individual joinder impossible.  The Class is therefore so numerous that joinder of all members would be impracticable. Questions of law and fact

common to the Class exist and predominate over questions affecting only individual members, including, *inter alia*:

> (a)    Whether Defendants' acts and practices in connection with the promotion, marketing, advertising, packaging, labeling, distribution and sale of the Contaminated Products were deceptive trade practices within the meaning of the Colorado Consumer Protection Act, Col. Rev. Stat. § 6-1-101, *et seq.* (the "CCPA");

> (b)    Whether Defendants breached warranties in the sale of the Contaminated Products;

> (c)    Whether Defendants' acts and practices in connection with the promotion, marketing, advertising, packaging, labeling and sale of the Contaminated Products unjustly enriched Defendants at the expense of, and to the detriment of, Plaintiff and other Class members; and

> (d)    Whether Defendants' conduct as set forth above injured consumers and if so, the extent of such injury.

50.    The claims asserted by Plaintiff in this action are typical of the claims of other Class members as her claims arise from the same course of conduct by Defendants as detailed above, and the relief she seeks is common.

51.    Plaintiff will fairly and adequately represent and protect the interests of the Class members.  Plaintiff has retained counsel competent and experienced in both consumer protection and class action litigation.

52.    Certification of this class action is appropriate under F.R.C.P. 23(b)(2) and (3) because the questions of law or fact common to the Class members as detailed above predominate over questions of law or fact affecting only individual members.    This

predominance makes class litigation superior to any other methods available for the fair and efficient group-wide adjudication of these claims.   Absent a class action remedy, it would be highly unlikely that other Class members would be able to protect their own interests because the cost of litigation through individual lawsuits would exceed any expected recovery.   Certification is also appropriate because Defendants have acted or refused to act, and continues to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.   Further, given the large number of consumers of the Contaminated Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

53.   A class action is an appropriate method for the group-wide adjudication of this controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.   The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be claimed with regard to the management of this action.

## FIRST CAUSE OF ACTION
(Violation of Colorado Consumer Protection Act ("CCPA"); Col. Rev. Stat. § 6-1-101, *et seq.*)

54.   Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

55.   The CCPA considers conduct a "deceptive trade practice" when "in the course of such person's business, vocation, or occupation, such person," *inter alia*:

a.   "Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property

or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith." Col. Rev. Stat. § 6-1-105(1)(e);

      b.    "Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Col. Rev. Stat. § 6-1-105(1)(u).

56.    The CCPA defines a "person" as "an individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity." Col. Rev. Stat. § 6-1-102(6). Each Defendant is a corporation and, therefore, a "person" within the meaning of the CCPA.

57.    As set forth in detail above, Defendants wrongfully marketed, advertised, promoted, packaged, labeled, distributed and sold the Contaminated Products as safe for consumption by children, in violation of Col. Rev. Stat. § 6-1-105(1)(e).

58.    Moreover, Defendants willfully failed to disclose, with the intention of inducing consumers to purchase the Contaminated Products, material information including, but not limited to the fact that the Products contained lead, in violation of Col. Rev. Stat. § 6-1-105(1)(u).

59.    As a result of the deceptive trade practices described above, Plaintiff and other members of the Class are entitled to damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Warranty)

60.    Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

61.    As set forth above, Defendants provided Plaintiff and other members of the Class with written express warranties indicating that the Contaminated Products were safe for human

consumption, including consumption by children.   The Contaminated Products were also provided with implied warranties that they were merchantable and would pass without objection in the trade or industry.   However, as detailed above, these Contaminated Products breached Defendants' express warranties and are not merchantable because the Contaminated Products contain lead and are not safe for human consumption, especially not consumption by children. As the Contaminated Products are foodstuffs, privity is not required to assert such claims against Defendants.

62.     By virtue of the breach of the above warranties, Plaintiff and other members of the Class have been damaged in an amount to be determined at trial in that, among other things, they purchased and overpaid for products that did not conform to what was promised as promoted, marketed, advertised, packaged and labeled by Defendants, and were deprived of the benefit of their bargain.

### THIRD CAUSE OF ACTION
(Unjust Enrichment)

63.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

64.     Defendants have benefited from their unlawful acts by receiving excessive revenue derived from the sales of the Contaminated Products.   Defendants appreciated and/or knew the benefit of the receipt of such excessive revenue.   This excessive revenue has been received by Defendants at the expense of Plaintiff and other members of the Class, under circumstances in which it would be unjust for Defendants to be permitted to retain the benefit.

65.     Defendants benefited from the unlawful conduct detailed herein by receiving revenues and profits derived from the sale of the Contaminated Products, which monies were had and received by Defendants to the detriment of Plaintiff and the Class.   Defendants appreciated the benefit of the receipt of such excessive revenues and profits.   These excessive revenues and

profits have been received by Defendants at their request based on the promotion of the Contaminated Products based on and resulting from monies paid, laid out and expended by Plaintiff and other members of the Class, under circumstances in which it would be unjust for Defendants to be permitted to retain these benefits based on the misleading and deceptive conduct as detailed above.  In this regard, Defendants did not provide Plaintiff or other members of the Class what they bargained for, a product that was free from lead.  The Products were worth less than Plaintiff and other members of the Class paid for them because the Products contained lead.  Plaintiff has made a demand for the return of such monies that has been refused.

66.     Plaintiff and other members of the Class are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendants in the form of their excessive revenue derived from the sale of the Contaminated Products from which Plaintiff and other Class members may make claims on a *pro rata* basis for restitution.

### FOURTH CAUSE OF ACTION
(Injunctive and Declaratory Relief)

67.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

68.      As set forth above, through the improper practices described above, Defendants have misrepresented the content of the Contaminated Products to Plaintiff and other members of the Class.

69.     Defendants' practices described herein are unlawful and against public policy. Therefore, Defendants' practices should be declared to be unlawful and Defendants should be prohibited and enjoined from engaging in these practices in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a)    Certification of the Class, certifying Plaintiff as representative of the Class, and designating her counsel as counsel for the Class;

b)    For a declaration that Defendants have committed the violations of law alleged herein;

c)    For an injunction prohibiting Defendants from engaging in the unlawful conduct alleged herein;

d)    For damages based on the violations of law alleged herein pursuant to, without limitation, Col. Rev. Stat. § 6-1-101, *et seq*., the amount of which is to be determined at trial;

e)    For damages based on breach of warranty, the amount of which is to be determined at trial;

f)    For equitable monetary relief;

g)    For pre- and post-judgment interest at the legal rate on the foregoing sums; and

h)    For such further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

DATED:  July 9, 2010          WHATLEY DRAKE & KALLAS, LLC


                              By:   /s/ Joe R. Whatley, Jr.
                                    Joe R. Whatley, Jr., Esq. (CO Bar No. 38820)
                                    jwhatley@wdklaw.com

                              Patrick J. Sheehan
                              psheehan@wdklaw.com
                              1540 Broadway, 37th Floor
                              New York, NY 10036
                              Tel: (212) 447-7070

Howard Rubinstein
howardr@pdq.net
914 Waters Avenue, Suite 20
Aspen, Colorado 81611
Tel:  (832) 715-2788

John G. Emerson
EMERSON POYNTER LLP
830 Apollo Lane
Houston, TX 77058-2610
jemerson@emersonpoynter.com
Tel:  (281) 488-8854

Scott E. Poynter
scott@emersonpoynter.com
Jack T. Patterson II
jpatterson@emersonpoynter.com
EMERSON POYNTER LLP
spoynter@emersonpoynter.com
The Museum Center
500 President Clinton Ave, Suite 305
Little Rock, AR 72201
Tel:  (501) 907-2555

Robert A. Jigarjian
jigarjianlaw@gmail.com
JIGARJIAN LAW OFFICE
128 Tunstead Avenue
San Anselmo, CA 94960
Tel:  (415) 341-6660

*Attorneys for Plaintiff*

**PLAINTIFF'S ADDRESS:**
Suzanne Kennedy
1452 Crystal Lake Road
Aspen, CO 81611